Br the Review Panel :
The United States Senate, by S. Res. 162, 91st Cong., 1st Sess., referred S. 1391 to the Chief Commissioner of the United States Court of Claims, “A bill for the relief of certain Kaw Indians,” pursuant to 28 U.S.C. §§ 1492 and 2509 (Supp. v, 1965-69).
The Chief Commissioner referred the case to Trial Commissioner Harry E. Wood for proceedings in accordance with the Rules, and designated the above-named members of the Review Panel to consider the Trial Commissioner’s opinion.
On the basis of stipulations filed and without conducting a trial since all of the facts had been stipulated, Commis *733 sioner Wood on April 8, 1971, filed bis opinion, findings of fact and conclusion. Commissioner Wood concluded that there was no constitutional taking of the property of the plaintiffs, nor a “valid basis * * * for concluding that respondent is equitably liable to petitioners as for a ‘taking’.” He concluded further that the defendant should not be held liable for the payment of interest on the amounts authorized in Private Law 90-318,82 Stat. 1420.
While the Eeview Panel agrees generally with the ultimate conclusions of Commissioner Wood, it deems it appropriate to state its conclusions somewhat differently. We have borrowed heavily from Commissioner Wood’s opinion and have adopted without change the findings of fact.
Briefs have been filed by the parties, with no exceptions by either party to the facts found by Commissioner Wood. The plaintiffs except, however, to the conclusions of the Commissioner, whereas the defendant requests the Review Panel to adopt the opinion and findings of fact as filed. The parties were afforded an opportunity, which was availed of, to argue the matter before the Review Panel. Each member of the Panel has carefully considered the entire record and concludes that there was no constructive taking by the United States of the lands referred to in the first section of the Act of August 8, 1968 (Private Law 90-318). Since the Senate Resolution calls upon the Chief Commissioner to report to the Senate “giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress as to whether there was a constructive taking by the United States of the lands referred to in the first section of the Act of August 8, 1968 (Private Law 90-318), and, if so, whether interest on the amounts authorized pursuant to such Act is legally or equitably due from the United States to the recipients of such amounts from January 1, 1862, until paid,” it would not appear necessary to consider the question of interest, since no constructive taking is found.
S. Res. 162 of September 24, 1969, reads as follows:
Resolved, That the bill (S. 1391) entitled “A bill foi the relief of certain Kaw Indians”, now pending in the Senate, together with all the accompanying papers, is hereby referred to the chief commissioner of the Court *734 of Claims; and the chief commissioner shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code, as amended by the Act of October 15, 1966 (80 Stat. 958), and report thereon to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress as to whether there was a constructive taking by the United States of the lands referred to in the first section of the Act of August 8, 1968 (Private Law 90-818), and, if so, whether interest on the amounts authorized pursuant to such Act is legally or equitably due from the United States to the recipients of such amounts from January 1,1862, until paid.
The reference requires a journey into the past. By Article 6 of the Treaty of June 3, 1825, 7 Stat. 244, 245, between the Kansas Nation and the United States, “reservations” from lands therein coded to the United States, of 1 mile square, were made for “each of the [twenty-three named or described] half breeds of the Kansas nation * * [1] The Act of August 8, 1968, Private Law 90-318, 82 Stat. 1420, for the relief of the said halfbreeds “or the heirs of any who- may be deceased,” in substance authorized the payment of a total of $73,600 to the heirs of the said halfbreeds “in full and final satisfaction of all claims of the named individuals or their heirs against the United States based upon the loss of Indian lands included in the twenty-three halfbreed Kaw allotments * * * and in full satisfaction of any claims of the original allottees or his [sic] heirs for the consequent loss of use of the land.”
S. 1391, referred to the Chief Commissioner, proposes to amend Private Law 90-318 in substance, by authorizing interest on the payments authorized by the said Act “at the rate of 6 per centum per annum from January 1, 1862, until paid.”
The petition filed herein October 24, 1969, alleges that, under the terms of the Treaty of June 3,1825, supra, the reserves were surveyed, set aside and peaceably occupied by the reservees; that thereafter whites “with the assistance of the Indian agent appointed by the Secretary of the Interior *735 * * * began forcibly taking the lands peaceably occupied by the half-breed Kaws”; that, the 1825 Treaty having vested all “right, title, and interest in the lands in the original designees * * * with protection of title guaranteed by the United States, this assistance by the local Indian agent * * * constituted a ‘constructive taking’ of the reserved lands by the United States * * * ”; and that those persons named in the 1825 Treaty were “lawful owners of the reserved * * * land” entitled to governmental “protection of their right, title and interest,” whose peaceable occupancy of the reserves was disrupted by United States citizens “aided by an agent of the United States resulting in a constructive taking * * [2]
The facts, detailed in the accompanying findings,[3] are here summarized.
In 1825 most of the “halfbreeds” (sometimes hereinafter “reservees”) were very young children. Their reserves were surveyed in 1827. The surveys were numbered 1 through 23. It was common to refer to an individual reserve by its survey number, and that method of reference will sometimes be used herein. (Findings 6,7.)
By 1845, several of the original reservees had moved to the reserves. (Finding 8.[4]) Their peaceful enjoyment of the reserves can not have lasted long, however; by 1853 white settlement in the area of the reserves was becoming well advanced, and the evidence is that the number of settlers in and on the reserves subsequently increased. (Findings 10,18.)
During the period 1853-1860, the reservees’ situation clearly did not improve. There was, in 1854, a “disreputable,” but unsuccessful, attempt by a Territorial Governor of Kansas, along with several other federal and territorial officials, to acquire the reserves by purchase. (Finding 11.) In 1855, a Kansas Indian agent was appointed who “was under a serious misapprehension of his duty as an Indian agent and *736 could not have benefitted the case of the halfbreeds.”[5] (Finding 12(a).) In 1856, the Commissioner of Indian Affairs stated that the “larger portion of the half-breed tract is now in the possession of trespassers, who have actually driven from their homes some of the half-breed Indian owners,” and the 1857 annual report of the Kansas Indian agent reflected that the reserves remained in the possession of “intruders.” The reserves had been and still were, this report added, “the center of speculative attractions.” (Findings 12(d), (e).)
Throughout this same period, the “Executive Department” uniformly held that “the Kansas half-breeds had no right to alienate their reserves under the treaty of 1825, having only a usufructuary interest therein * * * the uniform opinion of the Indian Department has been adverse to the power of the Kansas half breeds to sell or alienate the reserves.” (Findings 11 (b), (c).) There was about this time much correspondence directed to government officials concerning white settlement on the reserves; the reservees (or the heirs of deceased reservees) and their representatives generally sought some redress from “squatters,” while white interests in substance contended that, many of the original reservees having died, the reserved lands were open to preemption.[6] (Finding 13.)
In reply to a January 19,1858, House Resolution, the Secretary of the Interior reported to the House of Representatives on May 6,1858, that only nine of the original reservees were known to be surviving; that of these only four resided upon the reserves; and that these four were collected upon Surveys 1 and 2. The Secretary further reported that, except for Surveys 1 and 2, and perhaps one other, the reserves were in possession of some 60 or 70 white settlers who had occupied them without authority of law and who had maintained their *737 possession by force. The Secretary noted that in some instances reservees had been forcibly expelled from their lands and in others compelled to abandon their improvements by threats. (Findings 15,17.) He further stated that “the right of occupancy granted [by the 1825 Treaty] * * * was to exist as a perpetuity in * * * [reservees or their heirs]. They had all the rights incident to an estate in fee simple, except the right to sell, and this, I think, should now be given them.” (Finding 17.)
By 1860, some 13 (or more) of the original reservees reportedly had died, some with heirs and others without. (Finding 21(b); see also finding 23, reflecting the mortality situation as reported in early 1862.) Most of the reserves were by that time in the possession of white settlers.[7] (Findings 17, 18, 21(c).) The town of Rising Sun, a village of about 40 people with two operating sawmills, was located on Survey 19; and three towns (one adjacent to Survey 23, one across the Kansas River from Survey 19, and one, Topeka, across the River from Surveys 3 and 4) bordered the reserves. (Finding-18.) Reservees (or heirs) as to some ten surveys had been driven from the surveys, and other surveys were by then also in the possession of white settlers. Ibid.
By the Act of May 26, 1860,[8] 12 Stat. 21, Congress in substance (1) vested in original reservees then living “all the title, interest and estate of the United States” to the land “reserved, set apart and allotted to them respectively” by the Treaty of June 3,1825; (2) “vested and confirmed * * * all the title, interest or estate of the United States to the land allotted to deceased reservees” leaving heirs in “such persons as shall by the Secretary of the Interior be decided to be the heirs of such deceased reservees”; (3) provided that nothing in the said Act should be construed as giving any force or effect to contracts theretofore made by any “of said reservees or their heirs” for the sale or disposition of “any lands named in this act”; (4) authorized the Secretary of the *738 Interior, should any living reserves or the heirs of any deceased reservee desire not “to reside upon, or occupy the lands to which such reservees or such heirs are entitled by the provisions of this act,” when requested to do so “by them or either of them,” to sell the “lands belonging to those so requesting him, for the benefit of such reservees, or such heirs”; and (5) authorized the Secretary to sell, with the assent of the Kansas Nation, lands “allotted” to reservees deceased without heirs for the benefit of “the living re-servees, their heirs, and the heirs of those deceased, equally,” with “patents in the usual form” to be issued to the purchasers of “said lands, in accordance with the provisions of this act.”[9]
In August 1860, the Secretary appointed a special agent (Hugh S. Walsh) for the purpose of executing the 1860 Act. In 1861, following Walsh’s report, a special commissioner (William H. Coombs) was appointed. Coombs’ report, which included his findings as to persons (reservees or heirs) entitled to the surveys, was dated April 21,1862. The substance of both reports is set forth in findings 21-23.
Both Walsh and Coombs found reservees (or heirs) in possession of some five surveys (Surveys 2, 3, 4, 5, and 6, according to Coombs).[10] According to Coombs’ report, six reservees were then living (Surveys 1, 4, 5, 6, 16, and 23); three reservees were then deceased without heirs (Surveys 15, 17, and 18) ; and the remaining 14 reservees were then deceased with heirs.[11] Both Walsh and Coombs alluded to white settlers on the reserves. Coombs reported on the settler situation in some detail. Surveys 7-23, he stated, “have settlers on them, generally one to each quarter, except survey No. 19, upon which there is a town, with some thirty or forty houses, called Rising Sun.” Coombs identified a number of *739 settlers on Surveys 7-22;[12] all settlers on the surveys were, in the words of the parties’ Stipulation, mere “trespassers, claiming no other title than by right of preemption.” Coombs also reported that no claimant he had talked with wanted any land sold.[13] (Finding 22(c).)
The Coombs report to the Secretary is dated April 21, 1862. (Finding 23.) The next logical step thereafter was for the Secretary to execute the 1860 Act by, inter alia, entering an order based on the report identifying heirs of deceased re-servees and reservees deceased without heirs. (Finding 24.) While there is in evidence a memorandum drafted for that purpose, providing inter alia that patents should be issued to those persons found to be entitled to the lands, no such order pursuant to the Act of May 26, 1860, supra, was ever issued.
On May 29, 1862, the Senate passed a resolution calling upon the Secretary for a copy of Coombs’ and Walsh’s reports. (Finding 25.) By letter dated June 3, 1862, the Secretary complied with the resolution. Hid. The said letter states in part that the Act of May 26, 1860, supra,
* * * vested the title to the lands specified in said reports in certain half-breeds * * * to whom they were reserved * * * and to the heirs of such of said reservees as were deceased * * *.
The Secretary’s said letter also reflects that:
* * * there is a large number of settlers upon portions of these lands, some of whom have made improvements. These settlers claim that they have a right to purchase the lands. This department cannot recognize such a claim under the existing law, and, unless Congress shall interpose by some new legislation, it only remains to execute the act of Congress above referred to, by deciding who are the heirs of the deceased reservees, and perfecting their titles.
Shortly thereafter, on July 14, 1862, a bill (S. 98) to repeal sections two and three of the Act of May 26, 1860, supra, and so much of section one thereof as authorized the Secretary to determine heirs of deceased reservees, was introduced in the *740 Senate. Its sponsor, Senator Doolittle, stated that be had been directed by the Committee on Indian Affairs to “report a joint resolution in relation to a certain act concerning title to lands set apart for the use of the halfbreed Kansas Indians in Kansas Territory, and it is necessary that there should be immediate action upon it; for there may result such a decision on the part of the Secretary * * * based upon ex parte testimony, as may affect the titles of a great many persons.”
S. 98 was approved by both Senate and House, and was enrolled and signed July 17, 1862. Following its adoption, the Act of May 26, 1860, supra, provided in pertinent part only that:
* * * all the title, interest and estate of the United States is hereby vested in the said reservees who are now living, to the land reserved, set apart and allotted to them respectively by the said sixth article of said treaty * * *.
To quote from the Stipulation herein, one effect of the 1862 resolution was to raise “the question of who owned the land of the deceased reservees after the 1862 resolution.” For, prior to the Act of May 26, 1860, supra, the uniform position of the “Executive Department” had been that the interest created in reservees by Article 6 of the Treaty of June 8, 1825, supra, was not an “alienable” one.
In 1863, this question came to the attention of the Attorney General, when he was asked whether a patent might issue to the alleged sole heir of one of the reservees named in the 1825 Treaty. In response, the Attorney General stated that while the Act of May 26, 1860, supra, as amended, contained “an explicit confirmation of their lands to these half-breeds * * * I am, nevertheless, of opinion that * * * it was entirely superfluous,” the 1825 Treaty having vested in the reservees “a perfect title * * * [which] did not need the aid of any subsequent act of Congress to impart to it validity or strength.” The Attorney General further stated that the 1825 Treaty having failed to provide for the issuance of patents, a patent might lawfully be issued to the applicant therefor under the Act of December 22, 1854, 10 Stat. 599, and the record indicates that patents were issued on 13 (and perhaps *741 14) surveys between 1864 and 1926.[14] With, one possible exception, the record does not indicate the identity of any applicant for such patents.
Following July 17,1862,[15] there were recorded a number of deeds bearing the names of reservees or of persons appearing to be heirs of reservees and relating to lands included within the reserves. A summary of such deeds, relating to all or parts of all surveys except Surveys 8 and 18, appears in finding 29 (b). The record contains no specific evidence as to the circumstances surrounding execution of any of these post-1862 deeds. It is clear, however, that there were many recorded sales of land in most of the 28 surveys, and that the acreages, and total stated consideration,[16] involved are not insubstantial. Deeds aside, the record does not reflect what subsequently happened to those several surveys Coombs found to be in the exclusive possession of reservees or heirs in 1862.
As the court has recently observed, “ [i]n the general law of eminent domain there is no universal test to determine, where Congress has not expressed an intention to condemn, whether and when a taking has nevertheless occurred as a result of the Federal Government’s conduct; a court must always evaluate the individual circumstances of the case to answer those questions,” Klamath and Modoc Tribes v. United States, 193 Ct. Cl. 670, 685, 436 F.2d 1008 (1971). In such cases, the concept of “taking” can be, and frequently is, an amorphous one. Compare Klamath and Modoc Tribes v. United States, supra; Confederated Salish and Kootenai Tribes v. United States, 193 Ct. Cl. 801, 437 F.2d 458 (1971) United States v. Southern Ute Tribe, 191 Ct. Cl. 1, 423 F.2d 346 (1970), cert. granted, 400 U. S. 915 (1970) (on other issues); Three Affiliated Tribes of Fort Berthold Reservation v. United States, 182 Ct. Cl. 543, 390 F.2d 686 (1968).
*742 Senate Eesolution 162 alludes to a “constructive taking,” and whether interest is legally or equitably due. Section 2509, Title 28, United States Code (Supp. V, 1965-69), pursuant to which Senate Eesolution 162 has been referred, itself requires “conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.”[17]
The gravamen of petitioners’ complaint, as gleaned from the briefs, appears to be that all of the reserves were lost, to white “Settlers and trespassers” who took lands and to speculators who acquired them by applying pressures and inflicting frauds, because of respondent’s failure to protect Indian rights and interests. By neglecting to fulfill treaty agreements, and allowing Indians “to suffer the loss of the use of their lands,” petitioners urge, respondent “contributed to,” “supported,” and “approved” the actions of trespassers and speculators, and thereby effected a “taking” of the lands.[18]
Eespondent denies any taking, “constructive” or otherwise, of the reserves, asserting that it “did not participate with others in the acquisition of the [reserves].”[19] Its principal position is that under the Treaty of June 3, 1825, supra, title to the reserves was vested in fee simple in the respective reservees no later than 1827, when the reserves were surveyed. Thus, respondent argues, in substance if not in this precise terminology, reservees possessed from the outset an alienable and inheritable estate (and respondent had no duties toward them); uniform holdings of the Department of the Interior prior to 1860 that reservees did not have such an estate were erroneous; the Act of May 26, 1860, supra, was enacted on the basis of an erroneous Congressional assumption and, rather than having the intended *743 effect of creating rights, in fact placed upon the reserves restrictions “that had not previously existed”;[20] the 1860 Act was “superfluous”;[21] and, in July 1862, Congress “properly removed the [1880] statutory restriction against conveyances.”[22]
It is, of course, abundantly clear that respondent did not “take” the reserves in any traditional constitutional, sense. Cf. United States v. Klamath Indians, 304 U.S. 119, 123 (1938); Chippewa Indians v. United States, 301 U.S. 358, 375-76 (1937); Klamath and Modoc Tribes v. United States, supra. Indeed, analysis of petitioners’ arguments reveals the absence of any such claim. Petitioners neither assert nor have a legal claim founded upon a constitutional taking, and no interest is legally due on any amounts authorized by Private Law 90-318, supra. United States v. Nez Perce Tribe of Indians, 194 Ct. Cl. 490, cert. denied, 404 U.S. 872 (1971); Klamath and Modoc Tribes v. United States, supra; Confederated Salish and Kootenai Tribes v. United States, 175 Ct. Cl. 451, 455 (1966), cert. denied, 385 U.S. 921 (1966).
So to conclude, however, does not end the matter. What Senate Resolution 162 seems to require is decision whether, absent a constitutional taking, respondent, in the particular circumstances of this case, should nonetheless equi-fably be held responsible, as for such a “taking,” for any proved loss of the reserves. (See finding 4, n. 4, infra.)
Eespondent’s principal arguments for its conclusion that the “heirs of the Kansas halfbreed reservees are not entitled to interest in this case” [23]— that title to the reserves was vested in fee simple no later than 1827, and that subsequent administrative (and 1860 Congressional) actions rested upon erroneous premises — are too simplistic; they not only take no cognizance of realities, but tend to obfuscate the equitable view of the situation here required.
In passing, it is by no means clear that respondent correctly interprets the 1825 Treaty. Jones v. Meehan, 175 U.S. 1, 12 (1899), and Best v. Polk, 85 U.S. (18 Wall.) 112 (1873), *744 the bases for the argument of title in fee simple vested by 1827, appear to be factually distinguishable. Compare Smith v. Stevens, 77 U.S. (10 Wall.) 321, 325 (1870), where the Supreme Court observed by way of dictum that “it would seem that the contracting parties intended [a provision in the 1825 Treaty that the Kansas Nation should not sell ‘the lands herein reserved’ without permission of the United States] to apply to the individual members of the tribe * * *.” See also Swope v. Purdy, 23 F. Cas. 576 (No. 13,704) (C.C. D. Kan. 1870), flatly holding that legal title to the land (Survey 16) reserved to one of the reservees “did not vest in him by the treaty of 1825.” [24]
Whether respondent is on legally sound ground vel non, however, the fact is that at least prior to 1862, and apparently even thereafter in Kansas, the general understanding was that the 1825 Treaty did not vest an alienable or inheritable estate in the reservees.[25] And, respondent, to at least 1862, regarded the “halfbreeds” as its wards, entitled by treaty to protection of their rights.[26]
Accepting, then, for present purposes, that there was “an established special relationship between the Government and claimant Indians affecting the controverted subject matter,”[27] what consequences flow therefrom in this reference?
The record is not a pleasant or pretty one. It may fairly be said that, as a result of actions or inactions on the part of the executive and legislative branches of the government, at least some reservees (or heirs) were deprived of their right of use and occupancy of the reserves by trespassers and speculators. In the circumstances of this case, respondent plainly failed to meet those fiduciary obligations which, dur *745 ing the pre-1862 period, it viewed as owed to reservees. Lipan Apache Tribe v. United States, 180 Ct. Cl. 487, 499-502 (1967); Cf. Pueblo de Acoma v. United States, 18 Ind. Cl. Comm. 202 (1967).
The heart of the controversy appears to be whether the United States, without having exercised dominion over the lands in question, should be held responsible in damages for a Fifth Amendment taking because of its failure to drive off white settlers who had wrongfully intruded upon such lands. No cases have been cited and none have been found which are precisely in point. However, the case of Creek Nation v. United States, 318 U.S. 629 (1943), furnishes some guidance for our resolution of this problem. In that case the Supreme Court affirmed the Court of Claims decision denying recovery to the Indians who sought indemnification for injuries alleged to have been suffered by them as the result of the seizure and use of their land by private railroad companies. The Court stated the question presented in that case as “whether the United States has assumed treaty or statutory obligations which require it to indemnify the Creek and Seminole nations for injuries alleged to have been suffered by them as a result of the seizure and use of their land by private railroad companies.” [p. 631]
It appears that by treaties these Indians granted a right-of-way to railroads which the United States might later authorize to construct and operate routes across their lands. Thereafter, Congress by legislation authorized the construction and operation of railroads and in 1902 passed a general statute concerning future railroad construction in the Indian Territory. The Act contained a provision that railroads should pay a fixed annual sum per mile to the Secretary of the Interior for the benefit of the tribes. The Indians complained that the railroads had not complied with the treaties and statutes in that they had taken certain lands unnecessary for railroad purposes and that they failed to pay the annual mileage charge. The following language from the Court’s opinion is particularly apt:
That the government did not mean to assume an insurer’s responsibility for the payment of sums claimed by the Indians against the railroads is further shown by the fact that the Indians retained their own inde *746 pendent remedy for wrongs done them. The tribes have not yet been dissolved, and they have had, both as a general legal right and by virtue of the very section of the 1906 Act under discussion here, the power to bring actions on their own behalf. That the United States also had a right to sue did not necessarily preclude the tribes from bringing their own actions. [Footnotes omitted]
We are asked here to impose a liability on the government to these Indians for wrongs allegedly committed against the Indians by others. Appreciating the desire of Congress to recognize the “full obligation of this nation to protect the interests of a dependent people,” Tulee v. Washington, 315 U.S. 681, 685, we are unable to find in the words of the treaties or statutes upon which this action rests any such prodigal assumption by the government of other people’s liabilities as that for which the petitioners contend here. [318 U.S. 629, 640.]
In Nez Perce Tribe of Indians v. United States, 95 Ct. Cl. 1 (1941), cert. denied, 316 U.S. 686 (1942), one of the claims involved the value of gold alleged to have been removed from an Indian reservation by white people. The tribe relied upon a provision of the Treaty of 1855 which stated “nor shall any white man, excepting those in the employment of the Indian department [of the United States], be permitted to reside upon the said reservation without permission of the tribe and the superintendent and agent * * The court there held, on p. 9 of that opinion, “that no intention can be gathered therefrom that the defendant intended to guarantee that no white man should reside thereon and that it should respond in damages if they did.”
The court further stated :
Independent of treaty, the defendant as the sovereign power was under the duty of protecting the plaintiff in the peaceful occupation and possession of its property; Cherokee Nation v. Hitchcock, 187 U.S. 294; but this duty, of course, goes no further than a duty to use its forces to endeavor to prevent a threatened wrong and to afford it redress in its courts against the wrongdoer if the wrong is committed. No one has ever asserted that because a person’s rights are invaded by a stranger the sovereign is liable in damages for a failure to afford adequate protection. Cf. Choctaw and Chickasaw Nations v. United States, 75 C. Cls. 494. [95 Ct. Cl. 1, 9-10.]
*747 It should be remembered, as the findings show, that all but two of the 23 tracts involved in this case were the subject of deeds recorded after July 18, 1862 for substantial consideration (see finding 29). The record also shows that at least five of the 23 tracts involved herein were in the exclusive possession of the reservees (or heirs) in 1862.
It is concluded, therefore, and the Chief Commissioner should report to the Senate pursuant to the resolution, that there was no constructive taking by the United States of the lands referred to in the first section of the Act of August 8, 1968 (Private Law 90-318). Since a negative determination regarding this question is made, no conclusion concerning interest is regarded as being required by the terms of the resolution.
Findings or Fact

The 1825 Treaty

1. (a) Article 1 of the Treaty of June 3, 1825, 7 Stat. 244, between the Kansas Nation of Indians and the United States, reflects the cession by the Kansas Nation to the United States of a vast area of land in, and within stated boundaries lying west of, the State of Missouri.[1]
(b) Article 2 of the said Treaty reserved from the said cession, for the use of the Kansas Nation, a tract of land “to begin twenty leagues up the Kansas river, and to include their village on that river; extending West thirty miles in width, through the lands ceded in the first Article * *
(c) Article 6 of the said Treaty provided that “ [f ] rom the lands above ceded to the United States, there shall be made the following reservations, of one mile square, for each of the half breeds of the Kanzas nation, viz: For Adel and Clement, the two children of Clement; for Josette, Julie, Pelagie, and Victoire, the four children of Louis Gonvil; for Marie and Lafleche, the two children of Baptiste of Gonvil; for Laven-ture, the son of Francis Laventure; for Elizabeth and Pierre Carbonau, the children of Pierre Brisa; for Louis Joncas; for Basil Joncas; for James Joncas; for Elizabeth Datch- *748 erute, daughter of Baptiste Datcherute; for Joseph Butler; for William Bodgers; for Joseph Cote; for the four children of Cicili Compare, each one mile square; and one for Joseph James, to be located on the North side of the Kanzas river, in the order above named, commencing at the line of the Kanzas reservation, and extending down the Kanzas river for quantity.”
(d) Article 10 of the said Treaty provided in part that, “for injuries done by individuals, no private revenge or retaliation shall take place, but instead thereof, complaints shall be made by the party injured, to the other by the said nation, to the Superintendent, or other person appointed by the President to the Chiefs of said nation * * * if any robbery, violence, or murder, shall be committed on any Indian or Indians belonging to said nation, the person or persons so offending shall be tried and, if found guilty, shall be punished in like manner as if the injury had been done to a white man. * * * And the United States hereby guarantee, to any Indian or Indians, a full indemnification for any horses or other property which may be stolen from them by any of their citizens * *
(e) Article 11 of the said Treaty provided in part that “the said Kanzas Nation shall never sell, relinquish, or in any manner dispose of the lands herein reserved, to any other nation, person or persons whatever, without the permission of the United States for that purpose first had and obtained. And shall ever remain under the protection of the United States, and in friendship with them.”
(f) The said Treaty was ratified December 30, 1825.

The Congressional Reference

2. The Act of August 8, 1968, Private Law 90-318, 82 Stat. 1420, for the relief of the said 23 halfbreeds named or described in finding 1(c) supra, “or the heirs of any who may be deceased,” authorized and directed the Secretary of the Treasury to pay “to the persons determined * * * to be the heirs of the following named individuals their proportionate intestate share of the amount shown opposite their ancestor’s names * * *.” A total payment of $73,600, “in full and final satisfaction of all claims of the named indi- *749 victuals or their heirs against the United States based upon the loss of Indian lands included in the twenty-three halfbreed Kaw allotments * * * and in full satisfaction of any claims of the original allottees or his [sic] heirs for the consequent loss of use of the land” was authorized.
3. S. 1391, 91st Congress, 1st Session, “A bill for the relief of certain Kaw Indians” introduced March 7, 1969, proposes to amend the Act of August 8, 1968, supra, in substance by authorizing interest on the payments there authorized “at the rate of 6 per centum per annum from January 1, 1862, until paid.”
4. (a) Senate Resolution 162, 91st Congress, 1st Session, as originally drafted, provided that S. 1391 be referred to the Chief Commissioner of the Court of Claims pursuant to Sections 1492 and 2509, United States Code (Supp. V, 1965-69), for a report “giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States or a gratuity and the amount, if any, legally or equitably due from the United States to the claimant.”
(b) As approved September 24, 1969, Senate Resolution 162, 91st Congress, 1st Session, provides that the report to the Senate shall give “such findings of fact and conclusions thereon as shall be sufficient to inform the Congress as to whether there was a constructive taking by the United States of the lands referred to in the first section of the Act of August 8, 1968 (Private Law 90-318), and, if so, whether interest on the amounts authorized pursuant to such Act is legally or equitably due from the United States to the recipients of such amounts from January 1, 1862, until paid.”[2]
5. On October 24,1969, a petition, signed by Tommy Joe Dennison, Chairman, Kaw Tribal Council, was filed with the *750 Chief Commissioner of the Court of Claims. Proof was closed October 20, 1970, the parties having completed presentation of evidence by means of a stipulation (with supporting exhibits), and supplement thereto; briefing was completed December 21, 1970.

The Period 1885-1846

6. At the time of the Treaty of June 3, 1825, supra, most of the halfbreeds named or described in Article 6 thereof were children, ranging in approximate age from one to nine years. According to the most reliable evidence, the three Joncas brothers, Louis, Basil, and James, were in their early 20’s in 1825. Most of the children lived near present Kansas City in 1825, while the Joncas brothers were probably then employed by fur traders in the western plains and mountains.
7. The reserves set aside for the 23 halfbreeds in Article 6 of the Treaty of June 3, 1825, supra, were located on the north side of the Kansas Diver, commencing at the eastern line of the Kansas Indian [Reservation, 60 miles west of the mouth of the Kansas River, and extending eastward “down the Kanzas river for quantity.” (Finding 1(c) supra.) The said reserves were surveyed in 1827. The surveys were numbered 1 through 23.[3]
8. The skimpy evidence available contains no indication that the parents of individual reservees moved to and lived upon the reserves immediately following the 1827 survey, although many of the families of the reservees did reside near the reserves. As the individual reservees grew older and married, however, several of them moved with their families to the reserves, and began to occupy them. There is evidence that by 1845 (during which period five of the reservees had died), some six of the reservees had moved to the reserves.
9. Some time prior to 1841, there was a brief, and abortive, effort to extinguish rights to the reserves by treaty with the Kansas Nation. In 1841, an effort was made to extinguish the said rights by purchase. During that year Isaac McCoy, signing “on the part of the United States,” obtained from 11 *751 of the 23 reservees agreements conveying to the United States their interests in the reserves. The agreements were to be effective upon approval by the President. That approval was never obtained.[4] The evidence suggests that, in obtaining such agreements, McCoy was acting on his own, not pursuant to instructions from any governmental authority.

The Period 18.//,6-1860

10. Peaceful enjoyment by the reservees who moved onto the reserved lands by 1845 cannot have lasted long. Precisely when the first settlers came to the Topeka area and started to live on the reserved lands, is not known, but by 1853 settlement was becoming well advanced in the area.[5] The first intrusions by settlers were at the eastern end of the reserved lands, where there were few Indian inhabitants.
11. (a) In 1854, a newly appointed Territorial Governor of Kansas, along with several other federal and territorial officials, attempted to acquire the reserves by purchase. The Governor (and others) met with several of the halfbreeds, informing them that they could sell only to him or the United States, and in late 1854 succeeded in obtaining deeds (contingent on Presidential approval) covering three reserves and most of a fourth.
(b) Approval of the “contracts” so obtained was sought shortly thereafter. In January 1855, Commissioner of Indian Affairs Manypenny, in a report to the Secretary of the Interior recommending against such approval, stated in part as follows:
These agreements, even if, under the treaty, the Indians had a right to alienate their reserves, are not executed in accordance with the rules prescribed by President Jackson in cases of Indian conveyances. * * * the Executive Department has heretofore uniformly held that the Kansas half-breeds had no right to alienate their reserves under the treaty of 1825, having only a usufruc-tuary interest therein; and that all efforts to procure the *752 President’s approval of sales thereof had been hitherto resisted by this Department. * * * in my communication of the 18th of [November 1854] submitting * * * a letter from * * * the Kansas Agent, in respect to the disreputable attempt of certain Official functionaries to speculate in these lands, my opinion was fully and freely expressed, and recent events * * * have strengthened the convictions therein expressed of its demoralizing tendency upon the inhabitants of the territory, both Indian and white. * * *
(c) Upon receiving from one of ithe “functionaries” a defense of his activities concerning the reserves, Commissioner Manypenny, on April 27, 1855, stated in part that the Department of the Interior had uniformly held that original Indian title to the “reservations” was not extinguished by ratification of the Treaty of June 3, 1825, supra, and that, “as parties have presented the question, by submitting deeds for approval, the uniform opinion of the Indian Department has been adverse to the power of the Kansas half-breeds to sell or alienate the reserves * * *.”
(d) On July 30, 1855, the President declined to approve the 1854 “contracts” covering the reserves. The precise reason for the declination is unclear. Possible bases included, inter alia, a lack of power “of the Kansas half-breeds to sell or alienate their reserves” (finding 11 (c), supra); that the “contracts” had not been executed in accordance with rules applicable to Indian conveyances (finding 11(b), supra);[6] or that the sales price stated was far less than others would have willingly paid for the land.
12. (a) In 1855, a new Kansas Indian agent was appointed. His initial annual report of August 31, 1855, reflects that (in the words of the Stipulation) “he was under a serious misapprehension of his duty as an Indian agent and could not have benefitted the case of the halfbreeds.” After alluding to an outbreak of smallpox which had “continued fatally with the greater number of them,” he stated that this “seems to the great satisfaction and admiration of all those who have any acquaintance with the Kaws”; in his opinion at that time, “the Kansas are a poor, degraded, superstitious, thiev- *753 isb, indigent, tribe of Indians; * * * they must soon become extinct, and the sooner they arrive at this point, the better it will be for the rest of mankind.”[7]
(b) About 1855, several of the reservees (or members of the family of reservees), either were forced from reserves they had theretofore occupied, or found the reserves occupied 'by white settlers who refused to leave.[8]
(c) In October 1855, instructions were issued to the Kansas Indian agent to remove intruders on Indian lands. In his second annual report, dated October 1, 1856, which reflected a marked change in his attitude toward the Kansas Indians, the agent observed, that “the half-breed Kansas reservation, has for the last two years been the object of filthy speculation” ; that the “reservation, on which there are no Indians residing, has been, and is at this time, subject to the intrusion of lawless men, stripping the land of its timber, opening-farms, cultivating the soil, and appropriating the fruits to its own use”; that he had endeavored to remove the intruders on Indian lands in June 1856, only to find the “whole weight and influence of those whose duty it was to co-operate with me in the removal * * * thrown in favor of the intruders [who] declared the land was not Indian land, that it was public land, and that they would occupy it at all hazards”; [9] that the larger portion of the “reservation” was in the possession of whites; and that he sincerely hoped for Congressional action which would benefit “those poor, inoffensive, unsuspecting Indians, who have been wronged and outraged by lawless and crafty white men.” The agent further observed that although the Kansas Indians had “seen their country taken from them, and their property maliciously destroyed by * * * white men, they have remained quiet and peaceable, for which they deserve credit.”
*754 (d) The annual report, dated November 22, 1856, of the Commissioner of Indian Affairs to the Secretary of the Interior states, inter alia, that:
The larger portion of the half-breed (Kansas) tract is now in the possession of trespassers, who have actually driven from their homes some of the half-breed Indian owners. Such lawless conduct is very disreputable, and can result in no permanent advantage to those engaged in it, as the government must protect the halfbreed Kansas Indians in their rights.
(e) The agent’s third annual report, dated September 26, 1857, reflects in part that “the half-breed Kansas reservation still remains in the possession of the intruders. The ‘halfbreed Kaw’ land has been, and is yet, the centre of speculative attractions.”
13. As the white population in the area increased, there was much correspondence directed to officials of the federal government from local officials, settlers, reservees (or their heirs) and others, relating generally to the movement of settlers into the area of, and onto, the reserves. Such correspondence during the period 1855-1857, insofar as in the record, reflects concern on the part of all as to the interests of the reservees in the reserved lands; the reservees (or heirs) and their representatives generally sought some redress from “squatters,” while white interests in substance contended that, many of the original reservees having died, the reserved lands had “reverted back to the government,” were part of the public domain, and “could be preempted” by settlers.
14. In an opinion dated September 26, 1857 (9 Op. Att’y Gen. 110), the Attorney General stated that, according to information from the Secretary of the Interior and the Commissioner of Indian Affairs, “[t]he rights of the [reservees] Indian wards of the Government have been questioned and trampled upon, the efforts of their agents to protect them in person and property have been thwarted and rendered abortive by lawless combinations of speculators, and further invasions of their vested rights are threatened by men who seem to consider a resort to brute force perfectly legitimate, where the property of Indians is to be the prize,” and that “ [i]n many instances the Indian reservees have been deprived *755 of their property, and tbeir lives endangered by an attempt to resist intrusion upon the lands set apart for their use.”
In response to questions submitted in 1856 to his predecessor but unanswered, and resubmitted in 1857 to him, “as to the nature of the title by which the Kansas half-breeds hold their individual reserves, and also as to the applicability of the trade and intercourse law of the 30th June, 1834, to the Indian reserved lands in Kansas and Nebraska,” the Attorney General stated in part that:
By the treaty of St. Louis, the Kansas nation and the half-breed reservees are in lawful possession of their respective reservations, and have a perfect right to enjoy the peaceable occupation of their lands. Against all other individuals * * * their title is perfect and absolute; and under that treaty the Indians may claim security in their reservations, through the protection of the United States, by the highest sanction. I deem it, therefore, wholly unnecessary to determine, or even to inquire, whether the half-breeds have a title in fee, or only a usufruct interest; whether the original Indian title be extinguished or remain in the tribe; whether an inheritable estate be vested in the individual reservees or the reversionary interest be still in the nation. * * * It is of very little consequence to the Indian who shall inherit his lands when he is dead, if every man may plunder them while he is living; and it matters little to him whether he can grant them by deed, if they may be seized and held from him by force. * * * it is, in my judgment, sufficient to say, that the Indian half-breed reservees, their parents and their children, being in lawful possession of the respective sections reserved to them, their title can be questioned by no trespasser, intruder, or stranger, be he who he may; and that no white man * * * has a right to set his foot upon an Indian reservation. * * * the good faith of the United States is pledged * * * to protect the Indian occupant from * * * wrong-doers of any sort; and the whole force of the Government * * * should be promptly put forth, if necessary to vindicate that good faith.
The Attorney General also stated that “Indian country,” for the purposes of the “trade and intercourse law of the 30th June, 1834 * * * includes the Kansas reservations— both the individual reservations to the half-breeds, and the reservation to the tribe.” In his opinion, military force could *756 lawfully be employed to remove all trespassers on the reservations, and to drive them from lands unlawfully entered. He concluded that “[t]he Indians now complain loudly of individual injury and outrage, and the Government has, under the act of 1834, ample power, and is bound by the highest treaty obligation promptly to redress their wrongs.”
15. On January 19, 1858, the House of Eepresentatives adopted a resolution addressed to the Secretary of the Interior requesting him to “report to this House * * * any information that may be in his possession as to the condition of the reserves secured to the Kansas half-breed Indians under treaty of 1825, and whether said Indians or their heirs, or any part of them, are in possession of said reserves, together with his opinion as to the policy or propriety of taking the necessary steps to extinguish the Indian title to all reservations under any treaty with said Indians in the Territory of Kansas (protecting the rights of the Indians) and of giving to said Indians the fee in said reservations.”
16. On March 1, 1858, a group assertedly composed of “Reservees, and heirs of the Reservees named” in the Treaty of June 3, 1825, supra, appointed the husbands of three claimants to reserves as their attorneys “for the purpose of endeavoring to procure the rights granted to us by said [1825] treaty, and causing patents to be issued to said Re-servees, or their heirs, named in said treaty * * *.” On March 3, 1858, the three so 'appointed employed one Robert S. Stevens as attorney for the halfbreeds, and approximately a year later, March 8, 1859, Stevens, in a letter to the Commissioner of Indian Affairs, requested that patents issue; he also then suggested that a list of reservees living, and of the heirs of those reservees deceased, be prepared.[10] Stevens subsequently prepared and on January 9,1860, submitted to the Commissioner of Indian Affairs, at the latter’s request, such a list.
17. In the meantime, on May 6,1858, the Secretary of the Interior replied to the House Resolution of January 19,1858 (finding 15, supra) in part as follows:
* * * from the most authentic information in the pos *757 session of the Indian Office * * * but nine of the original reservees are known to be surviving. Of these, four only are residing upon the reservations. They do not, however, reside upon their own reservations, but are collected upon sections one and two, which were assigned by the treaty to the two children of Clement. It is not known with accuracy * * * where the remaining survivors reside, and whether those who are deceased left children who survive. With the exception of the two sections mentioned, and perhaps one other, the reservations are in the possession of white settlers, some sixty or seventy in number, who have occupied them without authority of law, and who maintain their possession by force. In some instances the reservees have been compelled to abandon their improvements by threats, and in others they have been forcibly expelled.
As to the “policy or propriety” of extinguishing Indian title and giving to the Indians “the fee,” the Secretary expressed this opinion:
* * * it would be proper to authorize the original re-servees or their heirs to sell their land, under such restrictions as may be necessary to protect them against fraud, and to secure them a fair price for the land, should they desire to sell. This would be equivalent to granting them the fee of the'land, and is a measure of relief to which the half-breeds are equitably entitled.
>]; #
* * * it may fairly be inferred that the right of occupancy granted [by the Treaty of June 3, 1825] was not designed to be personal merely, but was to exist as a perpetuity in the half-breeds and their descendants. They had all the rights incident to an estate in fee simple, except the right to sell, and this, I think, should now be given them. * * * It was meant that [the reserves] should belong to these particular Indians; the Indians so understood it, and the government * * * so understood it, and it is but just that such additional recognition of their rights should be placed of record, as the altered condition of affairs in the Indian country requires.
How far it would be proper, in carrying out this policy, to afford the settlers upon these lands an opportunity of purchasing the tracts upon which their improvements are located is a question which addresses itself exclusively to the consideration of Congress.
*758 18. During the years preceding 1860, settlers continued to enter Kansas Territory generally, and the area of the reserves in particular, in considerable numbers. By 1860 the town of Rising Sun (now Perry), a village of about 40 people with two operating sawmills, was located on Survey 19; and three towns (Williamstown, adjacent to Survey 23; LeCompton, across the Kansas River from Survey 19; and Topeka, across the River from Surveys 3 and 4) bordered the reserves. While the record is far from clear on details, it appears that, by 1860, original reservees (or persons claiming as heirs of original reservees) had occupied (at least for a time), or had endeavored unsuccessfully to occupy, some 15 or 16 of the 23 reserves. The evidence, insofar as available, shows that reservees, or heirs, as to Surveys 1, 10, 11, 16, 17, 19, 20, 21, 22, and 23, were driven from those surveys. Moreover, other surveys were by then also in the possession of white settlers.[11]

The Act of May 86,1860

19. (a) On April 13, 1860, Mr. Woodson, of Missouri, from the House Committee on Indian Affairs, “reported” a bill (H.R. 637, 36th Congress, 1st Session) “to settle the titles to certain lands set apart for the use of certain half-breed Kansas Indians in Kansas Territory * * [12] The bill, passed by the House that day and referred to the Senate,[13] provided in part that:
Whereas, by the sixth article of [the Treaty of June 3, 1825, supra\ there was reserved from the lands ceded by said treaty to the United States by said Kansas nation of Indians, one mile square of land for each of the half-breeds of the Kansas nation named in the said sixth article, which land has been surveyed and alloted to each of the said half-breeds in the order in which they are named in, and in accordance with the provisions of, the said sixth article * * *: Therefore,
Be it enacted by the Senate and House of Representatives of the United States of America in Congress *759 assembled, That [a title in fee simple] is hereby vested in the said reservees, who are now living, to the land reserved, set apart, and allotted to them respectively by the said sixth article of said treaty; and in case any of the said reservees named in the said sixth article are deceased and leaving heirs, then [a title in fee simple] to the lands allotted to such deceased reservees, is hereby vested and confirmed in such persons as shall by the Secretary of the Interior be decided to be the heirs of such deceased reservees; [and all contracts or instruments in writing, or otherwise, of any kind, for the sale or disposition of any of the lands named in the act, heretofore made by any of the said reservees or their heirs, are hereby declared null and void].
Sec. 2. And be it further enacted, That in case any of the reservees now living, or the heirs of any deceased reservees, should not desire to reside upon or occupy the lands to which such reservees or such heirs are entitled by the provisions of this act, the Secretary of the Interior, when requested by them, or either of them, so to do, is hereby authorized to sell such lands belonging to those so requesting him, for the benefit of such reservees, or such heirs. And the Secretary of the Interior is also authorized to sell the lands allotted to the reservees who are deceased leaving no heirs, for the benefit of the living reservees, their heirs, and the heirs of those deceased, equally; said lands to be sold in accordance with such rules and regulations as may be prescribed by the Commissioner of Indian Affairs and approved by the Secretary of the Interior; and patents in the usual form shall be issued to the purchasers of said lands, in accordance with the provisions of this act.
Sec. 3. And be it further enacted, That the proceeds of the land, the sale of which is provided for by this act, shall be paid to the parties entitled thereto, or applied by the Secretary of the Interior for their benefit, in such manner as he may think most advantageous to their interest.
(b) The Senate amended H.R. 637 as follows: Section 1 of the Senate version, in lieu of vesting “a title in fee simple” in “the said reservees, who are now living” or in “such persons as shall * * * be decided to be the heirs of such deceased reservees,” vested in living reservees “all the title, interest, and estate of the United States,” and in the heirs of deceased reservees “all the title, interest, or estate of the United States”; the House provision in Section 1 declaring all con *760 tracts for the disposition of reserves theretofore made “null and void” was replaced by a clause stating that “nothing herein contained shall be construed to give any force, efficacy, or 'binding effect to any contract, in writing or otherwise, for the sale or disposition of any lands named in this act, heretofore made by any of said reservees or their heirs”; and in the sentence in Section 2 authorizing the Secretary of the Interior to sell lands allotted to reservees deceased without leaving heirs, there was added after “sell” the phrase “with the assent of the Kansas nation of Indians.” As so amended, H.R. 637 passed the Senate May 7, 1860.
(c) On May 25, 1860, Mr. Etheridge, of Tennessee, from the House Committee on Indian Affairs, reported back H.R. 637, as amended, stating:
The amendments of the Senate are wholly immaterial, and may be considered as hypercritical; but, as they have been made, I hope the House will agree to them, and so dispose of the bill.
The House approved the bill as amended by the Senate, and it was enacted into law as the Act of May 26, 1860.12 Stat. 21.
20. On July 26,1860, for the purpose of executing the provisions of the Act of May 26, 1860, supra, the Commissioner of Indian Affairs appointed Hugh S. Walsh as a special agent with instructions to determine the identity of (a) the living reservees, (b) the heirs of deceased reservees, and (c) the identity of any reservees who had died without heirs. Walsh was also instructed to obtain written statements from the reservees or their heirs as to their desire to dispose of or retain the land, and, in the case of reservees who had died without heirs, to obtain permission of the Kansas Nation for the sale of the land of such reservees.
21. (a) In pursuance of his instructions, Walsh proceeded to the Kansas Territory in 1860 and there interviewed and obtained information from the Kansas Indian agent and from the chiefs and old men of the Kansas Nation. He also obtained the testimony of some halfbreeds, their husbands and of several traders in the Kansas City area.
(b) On February 18, 1861, following his investigation, Walsh reported to the Commissioner of Indian Affairs that the original reservees of Surveys 1, 4, 5, 6, 16 and 23, were *761 living. Heirs of deceased reservees were reported to have been found for those reservees who had been assigned Surveys 2, 3, 7, 8, 9, 10, 11, 12, 13 and 14. With respect to Surveys 19, 20, 21 and 22, Walsh identified three persons who were either reservees or heirs, but did not determine in which category they belonged. Walsh reported he had found no heirs of the reservees who had been assigned Surveys 15, 17 and 18.
(c) Walsh reported “quite a number of the reservees * * * living on the land, and some * * * heirs * * * also so living * * His report suggests that five surveys were so occupied. In it he also referred, without specification of details, to “settlers on these lands.”
(d) Walsh 'also obtained applications for sale, or other disposition, of reserves from a number of reservees or heirs.
22. (a) On December 23, 1861, one William H. Coombs was appointed special commissioner to take testimony and report his opinion as to the persons entitled to the halfbreed lands.
(b) On April 21,1862, Coombs made a report to Commissioner of Indian Affairs William P. Dole. He relied for the most part on testimony obtained by Walsh, stating that he had directed his inquiries chiefly to cases left in doubt by the testimony reported by Walsh, and that:
* * * although I have not been able in all cases to procure such testimony as would have been desirable, I believe that all the evidence which could have been procured by any reasonable degree of diligence has been obtained * * *.
Coombs made a personal examination of the land for appraisal purposes and to determine occupancy, by what title the occupant claimed, and the improvements on the land. In this respect, he made the following general observations:
These reserves are mostly rich alluvial bottom land, extending along the north side of the Kansas river from a point about four miles below the town of Lecompton to about one mile above Topeka. * * * some of the tracts were originally well timbered. The squatters and other trespassers have taken off all the best of the timber, and but little remains valuable for other purposes than fuel.
I found no less than four saw-mills on or immediately *762 adjoining these lands, which appear to have been in operation for years, procuring their logs exclusively from these lands. Indeed, almost all the lumber used in the valley, including the three towns of Lecompton, Tecumseh, and Topeka, seems to have come from these reserves.
iji % ijs #
Surveys No. 1 to 6, inclusive, are in the exclusive possession of the half-breed claimants, but all the other tracts have settlers on them, generally one to each quarter, except survey No. 19, upon which there is a town, with some thirty or forty houses, called Bising Sun. All the settlers on surveys from No. 7 to 23 inclusive, with the exception of Brown, of survey No. 9, are, so far as I could learn, mere trespassers, who have taken possession, claiming pre-emption rights. Some of them have forcibly expelled the half-breed claimants from their lands, and still keep them out by force.
% ^
* * * I have no doubt that these intruders have injured the lands to at least five times the value of all their improvements.
Those of the claimants who reside on their lands, or desire to reside on them, are very anxious to have patents issued to them as soon as possible. I deem this of the utmost importance to these people, as in that event the settlers at once abandon all hope of holding their preemption claims, and most of them leave the lands at once.
(c) Coombs also reported that he had inquired “of all the claimants I could find as to whether they desired all or any parts of their land sold by the Secretary of the Interior,” and that the answer was invariably in the negative.
(d) Coombs found reservees (or heirs) in possession of Surveys 2, 3, 4, 5 and 6.[14] On Surveys 7-22 (he gave no precise information in this respect about Survey 23)[15] he identified a number of settlers who, to quote from the parties’ Stipulation, “were trespassers, claiming no other title than by right of preemption.”
23. Coombs reported the following persons entitled to the respective surveys:
Survey 1: Adel Belmard, as original reservee.
*763 Survey 2: Adel Belmarcl, as heir of the original reservee Clement Lessert.
Survey 3: Joseph Pappan, one half; Louis Pappan, one-eighth; Achan Pappan, one-eighth; Mary Ogille Pappan, one-eighth; Susan Pappan, one-eighth, as heirs of the original reservee Josette Gonvil Pappan.
Survey 4: Julie Gonvil Pappan, as original reservee.
Survey 5: Pelagie Gonvil De Aubri, as original reservee.
Survey 6: Victoire Gonvil Pappan Smith, as original reservee.
Surveys 7 and 8: Baptiste Gonvil, one-sixth; Julie Pappan, one-sixth; Pelagie De Aubri, one-sixth; Victoire Smith, one-sixth; Elijah Fish, one-sixth; Louis Pappan, one twenty-fourth; Achan Pappan, one twenty-fourth; Mary Ogille Pappan, one twenty-fourth; Susan Pappan, one twenty-fourth, as heirs of the original reservees Marie and Lafleche Gonvil
Survey 9: Catherine Jane Laventure Brown, as heir of the original reservee Laventure.
Surveys 10 and 11: Pelagie Catalan, one-third; Louise Delorie, one-third; Victoire Hardy, one third, as heirs of the original reservees Elizabeth and Pierre Carbonau.
Surveys 12,13, and 14: John Basil, one-half; Louis Basil, one-half, as heirs of the original reservees John, James, and Basil Joncas.
Survey 15: None (Elizabeth Datcherute, original reservee, deceased without kno wn heirs).
Survey 16: Joseph Butler, as original reservee.
Survey 17: None (William Rodgers, original reservee, deceased without known heirs).
Survey 18: None (Joseph Cote, original reservee, deceased without known heirs).
Surveys 19, 20, 21 and 22: Charles LeCompt, one-third; Runi (or Remi) Hebert (Frank) LeCompt, one-third; Eliza LeCompt Byron, one-third, as heirs of the original reservees.
Survey 23: Joseph J ames, as original reservee.[16]
24 The parties have stipulated that, in accordance with the Act of May 26, 1860, supra, the next logical step after *764 Coombs submitted Ms report to the Secretary of the Interior would have been for the Secretary to enter an order based on that report naming living reservees and heirs of deceased reservees, and identifying reservees who had died without heirs. There is in evidence a memorandum drafted for this purpose; the draft memorandum provides that patents should be issued to those persons found to be entitled to the lands. The “next logical step” did not, however, occur.
The Joint Resolution of July 17, 1862
25. On May 29,1862, the Senate passed a resolution directing the Secretary of the Interior to transmit to it copies of the Walsh and Coombs reports. Compliance with the resolution was made by letter of June 8,1862, from the Secretary to the Senate, stating in part that the Act of May 26, 1860, supra,
* * * vested the title to the lands specified in said [Walsh and Coombs] reports in certain half-breeds to whom they were reserved * * * 'and to the heirs of such of said reservees as were deceased * * *.
The said letter also reflects that:
* * * there is a large number of settlers upon portions of these lands, some of whom have made improvements. These settlers claim that they have a right to purchase the lands. This department cannot recognize such a claim under the existing law, and, unless Congress shall interpose by some new legislation, it only remains to execute the act of Congress above referred to, by deciding who are_ the heirs of the deceased reservees, and perfecting their titles.
26. (a) On July 14, 1862, the Senate Committee on Indian Affairs reported a joint resolution (S. 98) to repeal sections two and three of the Act of May 26, 1860, supra, and also so much of section one 'as authorized the Secretary to decide who were the heirs of deceased halfbreed reservees. S. 98 was introduced by Senator Doolittle, of Wisconsin, who said:
I am directed by the Committee on Indian Affairs, to whom the subject was referred, to report a joint resolution in relation to a certain act concerning title to lands set apart for the use of the half-breed Kansas Indians in Kansas Territory, and it is necessary that there should be immediate action upon it; for there may result such *765 a decision on the part of the Secretary of the Interior, based upon ex parte testimony, as may affect the titles of a great many persons.
S. 98 passed the Senate July 14,1862.
(b) The joint resolution was considered in the House July 15, 1862, and passed, with its title amended to read “Joint resolution to repeal the second and third sections of * * *” the Act of May 26, 1860, supra.[17] The Senate concurred in the House amendment July 16, 1862, and the joint resolution was enrolled and signed July 17, 1862.
(c) Following the adoption of the July 17, 1862 resolution, the first section, Act of May 26, 1860, supra, provided as follows:
That all the title, interest and estate of the United States is hereby vested in the said reservees who are now living, to the land reserved, set apart, and allotted to them respectively by the said sixth article of said treaty; but, nothing herein contained shall be construed to give any force, efficacy or binding effect to any contract, in writing or otherwise, for the sale or disposition of any lands named in this act, heretofore made by any of said reservees or their heirs.
Events Following July 17, 1882
27. In 1863 the Attorney General was asked by the Secretary of the Interior whether issuance of a patent to an applicant therefor (the alleged sole heir at law of one of the re-servees named in the Treaty for the reserve (Survey 9) “surveyed and allotted” to the deceased reservee) would be proper. In answer, the Attorney General stated in part that:
The only part of the Act of May 26, 1860, * * * to which reference is necessary, is the first clause of the 1st section, the material part of the residue of that section, and the 2d and 3d sections having been repealed * * *. As it now stands the act of 1860 simply amounts to a legislative enactment that all the title, interest, and estate of the United States is thereby vested in the reservees (the half-breeds referred to) then living, to the land reserved, set apart, and allotted to them *766 respectively by the 6th article of the treaty [of June 3, 1825, supra].
!]i ‡
* * * the act of 1860 contains an explicit confirmation of their lands to these half-breeds * * * I am, nevertheless, of opinion that, as act of confirmation, it was entirely superfluous. For the title reserved and guaranteed to them by the treaty itself, was a perfect title, and did not need the aid of any subsequent act of Congress to impart to it validity or strength * * *.
The Attorney General further expressed the opinion that, under the Act of December 22, 1854, 10 Stat. 599, a patent might lawfully be issued to the applicant therefor.[18]
28. The record reflects that patents have been issued on surveys as follows:
Survey[19] Patentee Date Remarks [20]
15-. Elizabeth Datcherute.Mar. 31,1864 Elizabeth Datcherute died before 1841.
16_ Joseph Butler..Oct. 21,1871
18_ Joseph Cote.Oct. 2,1873 Joseph Cote died about 1848.
19-22. First, second, third and fourth chil- Jan. 21,1875 dren of
23— James.Sept 6,1875
Gonvil.Nov.
6— Victoire Gonvil.Sept. 5,1896
1_ a child of Clement.Feb.
2.... Clement, a child of Clement.Aug. 31,1926 Clement (the child) died prior to 1860.
3 — _ Josette Gonvil..Aug. 31,1926 Josette Gonvil died in 1843.
Each of the foregoing patents contained a proviso similar in content to the following:
Now Know Ye, That the United States of America, in consideration of the premises, Has Given and Granted, and by these presents Does Gave and Grant, unto the said * * * and to the heirs of said * * *, the tract of land above described; To Have and to Hold the said tract of land, with the appurtenances unto the said * * *, forever, with the proviso stipulated in the Act of Congress approved December 22, 1854, that this patent shall only operate as a relinquishment of title on the part of the United States and shall in no manner interfere with *767 any valid adverse right, if such, exist, to the same land, nor be construed to preclude a legal investigation and decision by the proper judicial tribunal between adverse claimants to the land.
Except for the application mentioned in finding 27, supra, there is no evidence as to the identity of any applicant for the foregoing patents.
29. (a) Prior to July 17, 1862, there were recorded a number of deeds pertaining to some of the reserves and bearing the names of halfbreed reservees or of persons appearing to be heirs of original reservees. Most of such deeds were executed not by signature, but only by mark, and none dated prior to July 17, 1862, is known to have been approved by the United States.
(b) Following July 17,1862, there were recorded a number of deeds bearing the names of halfbreed reservees or of persons appearing to be heirs of original reservees and relating to lands included within the reserves.[21] Most of such deeds were executed not by signature, but only by mark. Such deeds relate to all or parts of all surveys except Surveys 8 and 18. A summary of such deeds follows:

Survey Summary of Deeds

1 _Six deeds, dated in 1863 and 1864, from Adel and Moses Belmard relating to a total of approximately 560 acres, of winch approximately 60 acres were involved in two deeds; the total stated consideration for the six deeds was $2,500.
2-Ten deeds, dated in 1862 (2), 1863 (6), and 1865 (2), from Adel and Moses Belmard relating to a total of approximately 587 acres; the total stated consideration for the ten deeds was $2,872.50.
3-Some nine deeds, bearing names of some or all of the persons found by Coombs to be entitled to Survey 3 .(Josette Gonvil Pappan having died prior to 1860) ■and dated in 1862 (1), 1863 (1), 1864 (1), 1865 (3), 1866 (1), 1870 (1), and 1873 (1). Pour deeds, relating to a total of 560 acres, bore the ¡names of all such persons; the stated consideration for these four deeds was $2,600.
*768 4_Eleven deeds (two involving an unknown amount of acreage) from Julie Pappan (and, on ten of tlie eleven, Louis Pappan), dated between 1862 and 1871, and relating to some 497 acres; tbe total stated consideration for .tbe eleven deeds was $11,220 (including $250 for tbe two deeds involving an unknown (amount of acres).
5_Nine deeds (one involving an unknown amount of acreage) from Pelagie (Gonvil) De Aubri (and Amable De Aubri), dated between 1863 and 1868, and relating to some 492 acres; tbe total stated consideration for tbe nine deeds was $7,500.
6_Three deeds from Victoire (Gonvil) Smith (and William H. Smith), dated in 1863 and relating to some 130 acres; tbe total stated consideration for tbe three deeds was $557.50.[22]
7_One deed, dated December 26, 1863, bearing tbe names of most, but not all, of tbe persons found by Ooombs to be entitled to Survey 7, relating to all of Survey 7 for a stated consideration of $2,400.
9_Three deeds from Catherine Brown (and John Brown), dated between 1862 and 1867, relating to some 480 •acres; tbe total stated consideration was $4,000.
10 and 11_There were a number of deeds, bearing tbe names of one or more of tbe persons found by Ooombs to be 'entitled to Surveys 10 and 11, dated between 1863 and 1867 (and one quitclaim deed dated in 1880), apparently to “outsiders.” Tbe acreage and consideration picture are unclear.
12,13, and 14__There are a number of deeds (none bearing tbe names (of tbe persons Coombs found to be entitled to Surveys 12, 13, and 14, purporting to convey part or all of these three surveys. Tbe deeds are dated between 1863 and 1876; tbe total stated consideration was about $5,300.
15-One deed, from Louise and George Howard, dated November 11, 1863, relating to all of Survey 15 for I500.[23]
*769 16_One deed bearing the name of the original reservee and dated February 22, 1864, related to all of Survey 16 for $400; a subsequent deed bearing the same name and dated May 6,1868, related to 160 aeres for $500.[24]
17_Four deeds,[25] three dated in 1864 and one in 1868, relating to all of Survey 17; a total consideration of $2,000 for the deeds was stated.
19-22_Seventeen deeds, dated between 1862 and 1884, conveying all, and parts, of Surveys 19, 20, 21 and 22; some of the deeds bear the names of one or more of the persons found by Coombs to be entitled to these four surveys. The consideration picture is not clear.[26]
23_One deed, dated February 10,1864, bearing the name of the original reservee, and relating to all of ¡Survey 23 for $2,500.
30. (a) The record contains no evidence, specific or general, concerning the circumstances surrounding the execution of any of the deeds referred to in finding 29 (b). There are indicia in the record, relating to periods prior to July 17, 1862, that: reservees had theretofore been subjected to pressures and frauds; the reserves had long been the subject of “filthy speculation”; whites had for some years been in actual possession of large portions of the reserves; by 1862 much valuable timber had been stripped from the reserves; re-servees (and heirs of reservees) were scattered and without means of subsistence; and the belief that reserves of deceased reservees, with or without heirs, were subject to preemption was prevalent among whites.
(b) Bearing the foregoing indicia in mind, respondent’s assertion that, there “being no contrary evidence, the proof establishes that the majority of the reserves were sold for valuable consideration”[27] cannot be fully credited.
*770 (c) Neither, however, can petitioners’ tacit argument that all “sales” of the reserves were “under pressure and fraud,”[28] with no' compensation, and that all of the reserves were simply “lost” to trespassers and speculators.[20] Coombs reported at least five surveys to be in the exclusive possession of reservees (or heirs) in 1862; the record reflects sales of land, following July 17, 1862, in those (as well as in other) surveys for a stated consideration; the acreages and total stated consideration involved are not insubstantial; nothing-in the record shows that the stated consideration was not paid; and (deeds aside) nothing in the record shows what happened to those several surveys Coombs found to be in exclusive Indian possession in 1862.
(d) In sum, the most that can accurately be surmised from the record is that portions of the reserves were undoubtedly lost to white trespassers; that portions of the reserves were undoubtedly acquired by speculators through pressures and frauds; that, so far as the record shows, portions of the reserves were sold by reservees or heirs; and that what happened to some of the land in the reserves simply camiot be determined from the record.
31. The parties have furnished no evidence upon which to base any independent conclusions as to the value of the reserves during the 1860-1862 period, or at any other period of time.
32. The parties have furnished no evidence respecting interest rates in effect at any period of time.

 The Treaty was ratified December 30, 1825. For the location of the reserves, see finding 7.

 See also finding 4, n. 2, infra. As will be seen, petitioners now take another tack.

 The proof herein consists of a “Stipulation of Facts” of some 136 pages, filed August 14, 1970, based upon information contained in numerous documentary exhibits offered and received into evidence without objection, and a “Supplement to Stipulation” filed September 18, 1970.

 Five had died by that time. Ibid.

 The evidence reflects that the Commissioner of Indian Affairs promptly directed that the new agent be apprised of the nature and extent of his duties to the “untutored wards of the government,” and justifies the inference that there was a subsequent marked change in the agent’s attitude toward the “halfbreeds.” (Finding 12.) In 1856, he endeavored to remove whites from the reserves, failing because of a lack of assistance from a local military officer and a lack of assistance from, and apparent resistance of, territorial officials.

mu.

 In 1856, without response, and again in 1857, the Secretary of the Interior sought advice from the Attorney General respecting, inter alia, “the nature of the title by which the Kansas half-breeds hold their individual reserves * * (Finding 14.) The 1857 response to this question was less than direct. Ibid.

 The record is imprecise and sometimes contradictory, in this and in other respects.

 “To settle the Titles to certain Lands set apart for the Use of certain Half-Breed Kaw Indians * * (See finding 19.) The record suggests, and the parties agree, that the 1860 Act resulted from the above-noted letter of May 6, 1858, from the Secretary of the Interior to the House of Representatives.

 The Secretary was also authorized to pay any proceeds of sales of land to the “parties entitled thereto,” or to apply them “for their benefit.”

 (Findings 21(c), 22(d).) Coombs elsewhere stated that Surveys 1-6 were In the “exclusive possession of the half-breed claimants * * (Finding 22(b).) The evidence is that at least in, 1860, Survey 1 was one of several from which reservees (or heirs) had been driven. (Finding 18.)

 Coombs reported that three heirs were entitled to Surveys 19, 20, 21, and 22; with respect to these surveys, Walsh had earlier identified these three persons as either reservees or heirs, without determining in which category they belonged. This difference aside, Walsh’s report as to reservees and heirs agrees with Coombs’.

 It is a fair inference that settlers also were on Surveys 1 and 23. (Findings 18, 22(b).)

 Walsh had made a susbtantlally different report on this aspect of the matter. (Finding 21(d).)

 See finding 28 for the details; the “patents” issued were plainly not unqualified ones. Ibid.

 Respondent properly recognizes “the concurrent controversy concerning the validity of” certain deeds executed prior to July 17, 1862 (see finding 29(a)), and seems to place little, if any, reliance upon them. (Respondent’s Brief, pp. 16,17, 45.)

 While mathematical exactitude is not possible, the record suggests a total in the vicinity of at least $50,000. (See finding 29(b) ; see also finding 30, evaluating the conflicting positions of the parties as to the post-1862 deeds in light of the record.)

 "* * * the term ‘equitable claim’ as used in 28 U.S.C. 2509, is not used in a strict technical sense meaning a claim involving consideration of principles of right and justice as administered by courts of equity, but the broader moral sense based upon general equitable considerations.” Burkhardt v. United States, 113 Ct. Cl. 658, 667, 84 F. Supp. 553, 559 (1949) ; see also Adams v. United States, 175 Ct. Cl. 288, 358 F.2d 986 (1960).

 Petitioners’ Objections to Defendant’s Proposed Findings of Pact and Brief, p. 9. Petitioners do not now assert white intrusion with local governmental “assistance,” or that any Kaw Indian agent “aided” trespassers in obtaining possession of the reserves. Cf. p. 4, supra.

 Respondent’s Brief, p. 22.

 Respondent’s Brief, p. 13.

 Id. at p. 55.

 Id. at p. 15.

 Respondent’s Brief, p. 23.

 This decision was rendered some 7 years alter the Attorney General’s 1863 conclusion t-hat the 1825 Treaty had vested full and perfect title in the reservees. Cf. Cohen, Handbook of Federal Indian Law 206-07, n. 8 (1942), listing the 1825 Treaty as one by which “the Indian acquired title * * * in fee simple.”

 Respondent accurately observes that on occasion heirs of deceased re-servees took up residence on the reserves. To conclude, however, that this demonstrates Indian understanding of an alienable and inheritable estate created by the 1825 Treaty goes much too far.

 See Senate Report 91-183, 91st Congress, 1st Session, where the Department of the Interior states that one effect of the 1862 Act was “to terminate any trust responsibility that may have existed * *

 Lipan Apache Tribe v. United States, 180 Ct. Cl. 487, 502 (1967).

 See Kansas or Kaw Tribe of Indians v. United States, 80 Ct. Cl. 264 (1934), cert. denied, 296 U.S. 577 (1935) ; cf. Felix McCauley v. United States, 1 Ind. Cl. Comm. 608 (1951).

 The amendment to Senate Resolution 162 was offered on behalf of Senator Ervin of North Carolina, who introduced S. 1391. Senator Ervin’s letter of June 26, 1969, printed in the Congressional Record at his request, stated that the “ancestors of the Kaw Indians mentioned in S. 1391 were the victims of the brutality, selfishness and greed of white settlers in taking the land reserved * * * under the Kaw Treaty of 1825,” adding that the white settlers “acted with the concurrence and participation” of the Kansas Indian agent, and that “[i]n fact, it could be argued that there was a constructive taking on the part of the government.”

 It was common to refer to an individual reserve by its survey number, and that method of reference will sometimes be used herein.

 There is no evidence that such approval was sought. The agreements were found in the possession of McCoy’s son, in Missouri, in 1860, by Hugh S. Walsh. (See finding 21, infra.)

 A great influx of white settlers during that year was reported to the Commissioner of Indian Affairs in an annual report of John W. Whitfield, then the Kansas Indian agent.

 These regulations, Commissioner Manypenny stated in 1855, were not for the benefit of white settlers but for the protection of reservees or their heirs.

 The Commissioner of Indian Affairs promptly directed that the new agent be apprised “of the nature and extent of his duties to those untutored wards of the government,” and that the language of his report was improper, inconsistent with his obligations to the Indians, and unacceptable.

 The surveys involved to that point in time included Surveys 10 or 11, 16, 17,19, 20, 21, 22, and 23.

 The effort of removal failed, to use respondent’s words, “because of the refusal of the Captain of the united States Army to provide assistance, and the lack of assistance and apparent resistance of territorial officials.”

 Stevens’ letter also stated (inter alia) that the halfbreeds “have fine improvements in some instances, while in others the white man has driven them by force from their lands and compelled them to stay therefrom.”

 Compare findings 17 (1858), 21(c) (1860), and 22(d) (1862).

 S. 152, 36th Congress, 1st Session, was introduced February 14, 1860, for identical stated purposes.

 Phrases following the “Be it enacted” clause in brackets were changed by the.Senate. (Seefindings 19 (b), (c).)

 Cf. his statement, supra, re Surveys 1 — G being “in the exclusive possession of the half-breed claimants.”

 Cf. finding 22(b), supra.

 There is a marlced inconsistency in spellings of names throughout the record. For purposes of consistency, the 1825 Treaty spelling- has here been adopted.

 As passed by the Senate, the title was “A joint resolution to repeal and modify certain portions of an act mentioned therein.”

 Efforts of reservees (or heirs of reservees) prior to 1863 to obtain patents had uniformly failed.

 The record suggests that a patent may have been issued on Survey 9 to “Laventure” some time prior to August 11, 1863. Cf. finding 27.

 Remarks herein are taken from the Stipulation of the parties.

 Relationships, if any, between reservees and grantors are in many instances quite unclear.

 The record suggests that Victoire Smith died in late 1863 or perhaps early 1864, leaving a husband and three children, and that between 1864 and 1881 one or more of these people executed deeds relating to 90 acres for stated consideration totaling $1,030.

 Coombs’ report reflected that the original reservee, Elizabeth Datcherute, had died without heirs.

 See Swope v. Purdy, supra, holding that “the deed made In 1864, by Butler to plaintiff, conveyed the legal title.”

 Coombs was of the view that the original reservee had died without heirs.

 According to the parties’ Stipulation, one of the deeds (dated in 1884) related to all of Surveys 19-22, for $7,000. Respondent’s requested findings of fact allude, however, to deeds for which the grantors “received a total consideration of $1,779.”

 Respondent’s Brief, pp. 16-17.

 Petitioners’ Reply Brief, p. 4 ; id. pp. 7, 10.

. Id.,pp. 5,18.